# UNITED STATES v. SCOTLAND NECK CITY BOARD OF EDUCATION ET AL.

No. 70–130. Argued February 29–March 1, 1972—
Decided June 22, 1972*

STEWART, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, WHITE, and MARSHALL, JJ., joined. BURGER, C. J., filed an opinion concurring in the result, in which BLACKMUN, POWELL, and REHNQUIST, JJ., joined, *post*, p. 491.

*Deputy Solicitor General Wallace* argued the cause for petitioner in No. 70–130. With him on the brief were *Solicitor General Griswold, Assistant Attorney General*

*Together with No. 70–187, *Cotton et al. v. Scotland Neck City Board of Education et al.*, also on certiorari to the same court.

*Norman,* and *Brian K. Landsberg. Adam Stein* argued the cause for petitioners in No. 70–187. With him on the brief were *Jack Greenberg, James M. Nabrit III, Norman J. Chachkin, J. LeVonne Chambers, James R. Walker, Jr.,* and *Samuel S. Mitchell.*

*C. Kitchin Josey* and *William T. Joyner* argued the cause for respondents in both cases. With them on the brief were *Robert Morgan,* Attorney General of North Carolina, and *Ralph Moody,* Deputy Attorney General.

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioners in these consolidated cases challenge the implementation of a North Carolina statute authorizing the creation of a new school district for Scotland Neck, a city which at the time of the statute's enactment was part of a larger school district then in the process of dismantling a dual school system. In a judgment entered the same day as its judgment in *Council of City of Emporia* v. *Wright,* 442 F. 2d 570, a decision which we reverse today, *ante,* p. 451, the Court of Appeals held that the District Court erred in enjoining the creation of the new school district.

Scotland Neck is a community of about 3,000 persons, located in the southeastern portion of Halifax County, North Carolina. Since 1936, the city has been a part of the Halifax County Administrative Unit, a school district comprising the entire county with the exception of two towns located in the northern section. In the 1968–1969 school year, 10,655 students attended schools in this system, of whom 77% were Negro, 22% white, and 1% American Indian.

The schools of Halifax County were completely segregated by race until 1965. In that year, the school board adopted a freedom-of-choice plan that produced very

little actual desegregation. In the 1967–1968 school year, all of the white students in the county attended the four traditionally all-white schools, while 97% of the Negro students attended the 14 traditionally all-Negro schools. The school-busing system, used by 90% of the students, was segregated by race, and faculty desegregation was minimal.

In 1968, the United States Department of Justice entered into negotiations with the Halifax County School Board to bring the county's school system into compliance with federal law. An agreement was reached whereby the school board undertook to provide some desegregation in the fall of 1968, and to effect a completely unitary system in the 1969–1970 school year. The State Department of Public Instruction, acting on a request from the county board, recommended a detailed plan (the Interim Plan) for the unitary system that would have put some white students in every school in the county, and that would have left a white majority in only one school.

In January 1969, after the Interim Plan had been submitted to the county school board but before any action had been taken upon it, a bill was introduced in the state legislature to authorize the creation of a new school district bounded by the city limits of Scotland Neck, upon approval by a majority of the city's voters.[1] The bill was enacted on March 3, 1969, as Chapter 31 of the 1969 Session Laws of North Carolina. The citizens of Scotland Neck approved the new school

---

[1] An earlier bill had been introduced in the 1965 session of the legislature, which would have created a separate school district for Scotland Neck and the four surrounding townships; an area with a three-to-one Negro majority. It was contemplated that the new district would operate under a freedom-of-choice plan similar to that existing in the county at the the time. The bill was defeated in the State Senate.

district in a referendum a month later,[2] and the new district began taking steps toward beginning a separate school system in the fall of 1969.

The effect of Chapter 31 was to carve out of the Halifax school district a new unit with 695 students, of whom 399 (57%) were white and 296 (43%) were Negro. Under a transfer plan devised by the newly appointed Scotland Neck City Board of Education, 360 students (350 white and 10 Negro) residing outside the city limits applied to transfer into the Scotland Neck schools, while 44 students (all Negro) applied to transfer out of the city system to a nearby school in the Halifax County system. The new district planned to use the facilities of the formerly all-white Scotland Neck High School, including one building located outside the city limits that would be leased from the county.

The United States filed this lawsuit in June 1969 against both city and county officials, seeking desegregation of the existing Halifax County schools.[3] The complaint asked for preliminary and permanent injunctions against the implementation of Chapter 31. Various Negro children, parents, and teachers, the petitioners in No. 70–187, were permitted to intervene as plaintiffs.

After a three-day hearing before two district judges on both this case and a similar case involving two newly created school districts in neighboring Warren County,

---

[2] The vote in the referendum was 813 to 332 in favor of the new school district. Of Scotland Neck's 1,382 registered voters, 360 were Negro.

[3] After the preliminary injunction was issued in this case, the District Court dismissed the Halifax County Board of Education from that part of the case dealing with Scotland Neck's efforts to implement a separate school system. On May 19, 1970, the court ordered the county school board to implement, beginning in the fall of 1970, the Interim Plan proposed by the State Department of Public Instruction, with certain modifications proposed by the school board.

the District Court preliminarily enjoined the implementation of Chapter 31, finding that "the Act in its application creates a refuge for white students, and promotes segregated schools in Halifax County," and further that "[t]he Act impedes and defeats the Halifax County Board of Education from implementing its plan to completely desegregate all of the public schools in Halifax County by the opening of the school year 1969–70." [4] After further hearings, the District Court on May 23, 1970, found Chapter 31 unconstitutional and permanently enjoined its enforcement. 314 F. Supp. 65. The Court of Appeals reversed, 442 F. 2d 575, and we granted certiorari. 404 U. S. 821.

The Court of Appeals did not believe that the separation of Scotland Neck from the Halifax County system should be viewed as an alternative plan for desegregating the county system, because the "severance was not part of a desegregation plan proposed by the school board but was instead an action by the Legislature redefining the boundaries of local governmental units." 442 F. 2d, at 583. This suggests that an action of a state legislature affecting the desegregation of a dual system stands on a footing different from an action of a school board. But in *North Carolina Board of Education* v. *Swann,* 402 U. S. 43, decided after the decision of the Court of Appeals in this case, we held that "if a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct . . . the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees." *Id.,* at 45. The fact that the creation of the Scotland Neck school district was authorized by a special act of the state legisla-

---

[4] The opinion of the District Court on the issuance of the preliminary injunction is unreported.

ture rather than by the school board or city authorities thus has no constitutional significance.

We have today held that any attempt by state or local officials to carve out a new school district from an existing district that is in the process of dismantling a dual school system "must be judged according to whether it hinders or furthers the process of school desegregation. If the proposal would impede the dismantling of a dual system, then a district court, in the exercise of its remedial discretion, may enjoin it from being carried out." *Wright* v. *Council of City of Emporia, supra,* at 460. The District Court in this case concluded that Chapter 31 "was enacted with the effect of creating a refuge for white students of the Halifax County School system, and interferes with the desegregation of the Halifax County School system . . . ." 314 F. Supp., at 78. The Court of Appeals, however, did not regard the separation of Scotland Neck as creating a refuge for white students seeking to escape desegregation, and it held that "the effect of the separation of the Scotland Neck schools and students on the desegregation of the remainder of the Halifax County system is minimal and insufficient to invalidate Chapter 31." 442 F. 2d, at 582. Our review of the record leads us to conclude that the District Court's determination was the only proper inference to be drawn from the facts of this litigation, and we thus reverse the judgment of the Court of Appeals.

The major impact of Chapter 31 would fall on the southeastern portion of Halifax County, designated as District I in the Interim Plan for unitary schools proposed by the State Department of Public Instruction. The projected enrollment in the schools of this district under the Interim Plan, was 2,948 students, of whom 78% were Negro. If Chapter 31 were implemented, the Scotland Neck schools would be 57%

white, while the schools remaining in District I would be 89% Negro. The traditional racial identities of the schools in the area would be maintained; the formerly all-white Scotland Neck school would retain a white majority, while the formerly all-Negro Brawley school, a high school located just outside Scotland Neck, would be 91% Negro.

In *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, we said that district judges or school authorities "should make every effort to achieve the greatest possible degree of actual desegregation," and that in formulating a plan to remedy state-enforced school segregation there should be "a presumption against schools that are substantially disproportionate in their racial composition." *Id.*, at 26. And we have said today, in *Wright* v. *Council of City of Emporia, supra*, at 463, that "desegregation is not achieved by splitting a single school system operating 'white schools' and 'Negro schools' into two new systems, each operating unitary schools within its borders, where one of the two new systems, is, in fact, 'white' and the other is, in fact, 'Negro.' "

In this litigation, the disparity in the racial composition of the Scotland Neck schools and the schools remaining in District I of the Halifax County system would be "substantial" by any standard of measurement. And the enthusiastic response among whites residing outside Scotland Neck to the school board's proposed transfer plan confirmed what the figures suggest: the Scotland Neck school was to be the "white school" of the area, while the other District I schools would remain "Negro schools." Given these facts, we cannot but conclude that the implementation of Chapter 31 would have the effect of impeding the disestablishment of the dual school system that existed in Halifax County.

The primary argument made by the respondents in

support of Chapter 31 is that the separation of the Scotland Neck schools from those of Halifax County was necessary to avoid "white flight" by Scotland Neck residents into private schools that would follow complete dismantling of the dual school system. Supplemental affidavits were submitted to the Court of Appeals documenting the degree to which the system has undergone a loss of students since the unitary school plan took effect in the fall of 1970.[5] But while this development may be cause for deep concern to the respondents, it cannot, as the Court of Appeals recognized, be accepted as a reason for achieving anything less than complete uprooting of the dual public school system. See *Monroe* v. *Board of Commissioners*, 391 U. S. 450, 459.

*Reversed.*

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE BLACKMUN, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST join, concurring in the result.

I agree that the creation of a separate school system in Scotland Neck would tend to undermine desegregation efforts in Halifax County, and I thus join in the result reached by the Court. However, since I dissented from the Court's decision in *Wright* v. *Council of City of Emporia, ante,* p. 471, I feel constrained to set forth briefly the reasons why I distinguish the cases.

First, the operation of a separate school system in Scotland Neck would preclude meaningful desegregation in the southeastern portion of Halifax County. If Scotland Neck were permitted to operate separate schools, more than 2,200 of the nearly 3,000 students in this sector would attend virtually all-Negro schools located just

---

[5] The figures supplied to the Court of Appeals were updated by an affidavit submitted to this Court, showing the total enrollment in the Halifax County schools at the start of the 1971–1972 school year to have been 9,094, of whom 14% were white.

outside of the corporate limits of Scotland Neck. The schools located within Scotland Neck would be predominantly white. Further shifts could reasonably be anticipated. In a very real sense, the children residing in this relatively small area would continue to attend "Negro schools" and "white schools." The effect of the withdrawal would thus be dramatically different from the effect which could be anticipated in *Emporia*.

Second, Scotland Neck's action cannot be seen as the fulfillment of its destiny as an independent governmental entity. Scotland Neck had been a part of the county-wide school system for many years; special legislation had to be pushed through the North Carolina General Assembly to enable Scotland Neck to operate its own school system. The movement toward the creation of a separate school system in Scotland Neck was prompted solely by the likelihood of desegregation in the county, not by any change in the political status of the municipality. Scotland Neck was and is a part of Halifax County. The city of Emporia, by contrast, is totally independent from Greensville County; Emporia's only ties to the county are contractual. When Emporia became a city, a status derived pursuant to longstanding statutory procedures, it took on the legal responsibility of providing for the education of its children and was no longer entitled to avail itself of the county school facilities.

Third, the District Court found, and it is undisputed, that the Scotland Neck severance was substantially motivated by the desire to create a predominantly white system more acceptable to the white parents of Scotland Neck. In other words, the new system was designed to minimize the number of Negro children attending school with the white children residing in Scotland Neck. No similar finding was made by the District Court in *Emporia*, and the record shows that Emporia's decision was not based on the projected racial composition of the proposed new system.