Linda STOUT, by her father and next friend, Blevin Stout, et al., Plaintiffs-Appellees Cross Appellants,

v.

JEFFERSON COUNTY BOARD OF EDUCATION, et al., Defendants-Appellees Cross Appellants,

v.

UNITED STATES of America, Intervenor-Appellant Cross Appellee.

No. 75–2978.

United States Court of Appeals, Fifth Circuit.

Aug. 10, 1976.

Wayman G. Sherrer, U. S. Atty., Birmingham, Ala., Paul F. Hancock, Brian K. Landsberg, Ed. Section, Civil Rights Div., Dept. of Justice, J. Stanley Pottinger, Asst. Atty. Gen., William C. Graves, Atty., Appellate Section, Dept. of Justice, Washington, D. C., for appellant.

Maurice F. Bishop, Donald B. Sweeney, Jr., Birmingham, Ala., for Jefferson County Bd. of Ed.

Thomas R. McEniry, Bessemer, Ala., for Medfield Bd. of Ed.

U. W. Clemon, Birmingham, Ala., Norman Chachkin, Jack Greenberg, New York City, for other interested parties.

Before CLARK and GEE, Circuit Judges.*

GEE, Circuit Judge:

The United States alone appeals from the most recent order of the district court in the Jefferson County school case.

The basic desegregation plan for this district was approved by this court some time ago. *Stout v. Jefferson County Board of Education,* 466 F.2d 1213 (5th Cir. 1972). Since then great progress has been made, aided by increasing good faith and mutual confidence on all hands, for which the parties are to be commended. We have approved a trial-court order modifying two attendance zones and directing retention of jurisdiction by that court. 483 F.2d 84 (5th Cir. 1973). A subsequent opinion affirmed other, relatively minor, actions of the court below. 489 F.2d 97 (5th Cir. 1974). The present appeal is limited to reviewing the trial court's disposition of questions affecting two schools located in the Wenonah attendance zone. These are Roosevelt Elementary (grades 1–6) and A. G. Gaston (grades 7–9), and the difficulty with them is that the order below leaves both all black. The court below amply recognized the undesirability of this circumstance but, after considering all features of the situation presented to it, could devise no effective remedy for it. No more able than it to envision such a remedy, and unwilling to attempt to do from a distance what the trial court thought infeasible on the spot, we reluctantly affirm.

The large Wenonah zone presented to the district court an essentially all-black junior high and high school, Gaston, produced at least in part by a boycott by the 15–20% white students projected for it under an earlier plan. A like situation obtained at Roosevelt. Both of these schools lie in the north-west tip of the Wenonah zone. Also within the Wenonah zone, in its western central portion, lies Lipscomb (grades 1–9), successfully desegregated and functioning with a 60–40 white-black pupil roster. Finally, in the southeastern quadrant of the zone lies Shannon (grades 1–6), a small school in a former mining community, with a capacity of 140 students and an all-white enrollment of 78.

■ To the east of Wenonah lies the essentially all-white Berry zone. Distances between the corresponding facilities in the two zones are calculated by the United States as 9.2 and 11.0 miles, and by the Board (along somewhat different routes) as 11.0 and 13.7. Transportation times are similarly calculated, respectively, as 20–23 and 33–41 minutes, one way. Although these factors, standing alone, would not seem prohibitive for the bussing of junior high students, the trial court refused to order any bussing between the Berry and Wenonah zones because of a geographical barrier dividing the two zones. Shades Mountain, a chain of substantial hills or small mountains, rises along the western boundary of the Berry zone, presenting an almost sheer bluff toward Wenonah. Only two roads across Shades Mountain are suitable for transporting students between the zones. One is a major truck route which, as it descends the mountain, has produced more accidents than any segment of road of similar length in Alabama. The other is steep and winding and carries a heavy volume of automobile traffic during morning school hours. These considerations, together with those of time and distance mentioned, caused the trial court to reject bussing across Shades Mountain between the Berry and Wenonah zones as dangerous and infeasible. We cannot gainsay this conclusion, which is clearly a reasonable one on the facts presented.

Beyond the northern end of Shades Mountain, however, lies Shades Valley High School, an outstanding school with excess capacity which can be reached from Wenonah by end-running the mountain range. To it the court assigned students from Gaston grades 10–12, thus achieving a desegregated school experience for all Wenonah zone and Shades Valley high school students and leaving Gaston to function as a junior high.

* This case has been decided by a quorum. *See* 28 U.S.C. § 46.

■ The other possibilities considered by the lower court, and urged upon us by the United States, involve pairing of Gaston and Roosevelt Elementary with schools in the adjacent Midfield or Homewood Zones, or with Lipscomb school in the Wenonah Zone. The lower court declined to adopt either proposal.

The issue is close and troubling. On the one hand we confront the existence of two all-black and one all-white (as it falls out in practice) neighborhood schools in a system approximately 80% white.[1] Efforts by the court in earlier orders to assign white students to the first two of these schools have been met by refusal of these students to attend them, and the districts with which the United States urges they be paired are themselves desegregated and functioning effectively. It was the court's conclusion that adopting the government's proposals "would . . . mean the loss of desegregated education at schools which are 30–35% black at this time, a loss of such experience to both whites and blacks, without actually providing such an experience to the Gaston and Roosevelt students." We cannot but regard this conclusion by Judge Pointer, who has struggled with these problems effectively over the years, with great deference. On the other hand, the court concluded, and we agree, that the former dual school system has been effectively dismantled and a unitary system substituted here.

The small all-white school, Shannon, comprises primary grades only in a relatively small and isolated community. The anomaly presented by the two black schools results from the presence of a neighborhood enclave pressed against a geographical barrier and abutting on successfully desegregated districts rather than from the segregative act of any authority whatever.

■ The United States, however, attacks the lower court's refusal to pair these two schools with the abutting districts as impermissibly grounded in a fear of "white flight," citing *United States v. Scotland Neck City Board of Education,* 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). It stresses the Court's observation there that white flight "cannot . . . be accepted as a reason for achieving anything less than complete uprooting of the dual public school system." 407 U.S. at 491, 92 S.Ct. at 2218. With this we fully agree—a circumstance fraught with insignificance since we are duty-bound to follow it in any event. But it is unnecessary even to go beyond the quoted statement to its context in order to demonstrate its inapplicability to the case in hand. For here the district court has found, and indeed the United States does not seriously dispute, that in Jefferson County the uprooting of which the Court spoke has been done and a unitary system is operating.[2]

It cannot be gainsaid, however, and the district judge's opinion evidences—in the passage quoted above and elsewhere—that he settled on the plan attacked and rejected the government's more sweeping proposals because he feared the latter would in practice produce not more but less desegregation. To do so is to consider "white flight," and if to do so is always and in all circumstances forbidden, the court's order must fall. But we think the issue so posed to be a false one.

We have found no authority declaring that in choosing between various *permissible* plans a chancellor may not elect one calculated to minimize white boycotts. The teaching of *Scotland Neck* is that he may not refuse to adopt a permissible plan and elect or confect one which preserves a dual system because of such fears. The true issue, then, is whether the plan adopted by the court below was, given the circumstances, a permissible one. Not without reservations, we conclude it was.

1. The operative percentages are somewhat lower as a matter of practicality, since well over four thousand white students reside in the predominantly white neighborhoods east of Shades Mountain.

2. And, if more be required, the context of *Scotland Neck* was one in which local authorities advanced fear of white flight as a reason for refusing to attempt to dismantle an existing dual system.

In so concluding, our guiding lights are the trial court's conclusions that the Jefferson County system has been effectively desegregated and is unitary and that these three one-race schools are the products of geography and demography alone. If these conclusions are sound, and they appear to be, then any bussing of pupils attending these three schools would be ordered in the name of racial quotas or balancing. The constitution does not require such orders. As another respected district judge has recently written, in a similar case:

> "While it is clear that in disestablishing a segregated school system all vestiges of racial segregation must be eliminated 'root and branch,' *Green v. County School Bd.,* 391 U.S. 430, 437–438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the establishment of a fixed racial quota in each school is not required by the United States Constitution. The United States Supreme Court has ruled that
>
>> [t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.
>
> *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).
>
> "Thus, it appears that a balance must be reached, one unquestionably subtle in its implications: while school system segregation must be actively disestablished, racial quotas for student population are not to be instituted.
>
> "The difficulty of analysis is most acute when the Court is confronted, as it is in this case, with several schools which contain a student population which is largely of one race. . . . The Supreme Court has, in a general manner, addressed the question of one-race schools, writing in *Swann* that
>
>> [t]he record in this case reveals the familiar phenomenon that in metropolitan areas minority groups are often found concentrated in one part of the city. In some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change. Schools all or predominantly of one race in a district of mixed population will require close scrutiny to determine that school assignments are not part of state-enforced segregation.
>
> "In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law. . . . ."

*Carr v. Montgomery County Board of Education,* 377 F.Supp. 1123, 1133–34 (M.D.Ala. 1974), aff'd, 511 F.2d 1374 (5th Cir.), cert. denied, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975).

The unfortunate presence of these three one-race schools, serving just over 1100 total pupils, in a desegregated system serving many thousands, is to be deplored. But they are the result of demography; the system as a whole is desegregated and the overwhelming majority of all students attend such facilities; and finally, even the students of these schools will be exposed to complete desegregation at the high school level. *See id.* at 1138.

Nevertheless, partly in view of the presence of such conditions in the system, we conclude that it must continue under the scrutiny and surveillance of the district court. And in view of their existence it would be appropriate, though we do not require it, for the district court to give especial and renewed consideration to the possibility of broadening and making more attractive its existing majority-to-minority transfer procedures and to the possibility of enriching and strengthening the curriculum to magnet levels in the Roosevelt and Gaston facilities themselves.

AFFIRMED.