577 F.2d 1032
 Ronald BRADLEY et al., Plaintiffs,
William G. Milliken, Frank J. Kelley, Allison Green and
Perry Johnson, in their official capacities,
Michigan Department of Corrections and
Michigan Commission of
Corrections,
Defendants-
Appellants,
v.
DETROIT BOARD OF EDUCATION, Defendant-Appellee.
Ronald BRADLEY et al., Plaintiffs,
The Salvation Army, Defendant-Appellant,
v.
DETROIT BOARD OF EDUCATION, Defendant-Appellee.
 Nos. 76-2311, 76-2312.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 17, 1978.
Amended Opinion June 8, 1978.
 
 Frank J. Kelley, Atty. Gen. of Mich., Robert A. Derengoski, Charles Hackney, Lansing, Mich., for defendants-appellants in No. 76-2311.
 George T. Roumell, Jr., Jane K. Souris, John F. Brady, Samuel E. McCargo, Riley & Roumell, Detroit, Mich., for defendant-appellee in No. 76-2311.
 Wilber M. Brucker, Jr., McInally, Rockwell, Brucker, Newcombe & Wilke, Wayne G. Wegner, Detroit, Mich., for defendant-appellant in No. 76-2312.
 George T. Roumell, Jr., Jane K. Souris, John F. Brady, Samuel E. McCargo, Riley & Roumell, Detroit, Mich., Frank J. Kelley, Atty. Gen. of Mich., Charles D. Hackney, Lansing, Mich., for defendant-appellee in No. 76-2312.
 Before PHILLIPS, Chief Judge, and EDWARDS and PECK, Circuit Judges.
 JOHN W. PECK, Circuit Judge.
 
 
 1
 This matter, in the form of a school desegregation case, has over a protracted period of time been the subject of attention of the district court, this Court and of the Supreme Court. See Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), reversing the en banc decision of this court reported at 484 F.2d 215 (1973). The most recent decision of this Court is reported at 540 F.2d 229 (1976). The matter which is the subject of the present appeal, however, while having at its core issues arising out of the desegregation orders which have emanated from the earlier litigation, varies in form from that of the typical school desegregation proceeding. At its heart is a contract to sell real estate under circumstances and with a potential result which are alleged to be inimical to the desegregation of the Detroit School System.
 
 
 2
 The real estate involved is a parcel of land on which stands the Evangeline Residence which is owned by added defendant-appellant Salvation Army, and operated by it for a number of years as a resident facility for unmarried working women. A portion of the property located at the northeast corner of Henry Street and Second Avenue in the City of Detroit serves it as a parking area, the building itself being approximately 100 feet north from the intersection. Cass Technical High School, one of the twenty-one general high schools in the Detroit Public School System and a magnet school in the desegregation program, is situated in a multi-story building which occupies most of the block which is south of Henry Street and west of Second Avenue. The school itself is located one block south of the Evangeline Residence, which is directly across the street from the area owned by the school district and used for the school's playing fields, tennis courts and running tracks in connection with its athletic and physical education activities.
 
 
 3
 * The difficulty giving rise to the present appeal developed when the Michigan Department of Corrections became aware of the availability of the Evangeline Residence and, following negotiations, a purchase contract was entered into and a proposed closing date of May 24, 1976, was agreed upon. The Salvation Army immediately proceeded to vacate the premises, which were in fact empty as of May 21, 1976.
 
 
 4
 The Department of Corrections contemplated using the 180 room Evangeline Residence in connection with its program of community corrections centers, generally referred to as "half-way houses." Residents in this system are approaching the earliest date upon which they could be granted parole, and usually are within six months of their earliest release dates when placed in a center, although those having assured employment may be assigned there as early as one year prior to the earliest release date. Applicants for participation in this voluntary program are carefully screened at several levels, and several categories, such as those having a history indicating a pattern of assaultive crimes, having had a previous association with organized criminal activities, having a history of predatory sex offenses, or having a history of dealing in drugs more extensively than occasional sporadic sales to support the seller's personal habit, are automatically excluded.
 
 
 5
 A typical public reaction to the corrections centers program is that it is a good one, "but don't put a half-way house in my neighborhood," and that in effect was the reaction of the defendant-appellee Detroit Board of Education to the idea of using the Evangeline Residence for that purpose. The Board filed its petition for an injunction and in due course the district court filed its Memorandum Opinion finding that the community perceptions of the intended corrections center's use of Evangeline Residence would substantially impede the plan to desegregate the Detroit School System and holding the State Agencies and the Salvation Army permanently enjoined from consummating the sale/purchase agreement and from converting the property to corrections center use.
 
 
 6
 In the course of amassing an extensive record prior to the issuance of the injunction, the district court heard a great deal of testimony concerning what it termed the "community perception" of the disastrous results to the Cass Technical High School of permitting the Evangeline Residence to become a half-way house. The principal thrust of this evidence was that the community perceived that students and school personnel would be the subjects of attack and molestation, and that this perception would cause parents to refuse to enroll their children as students there, and to remove those previously enrolled. In basing his entire conclusion squarely on this community perception theory, a phrase which has never been used by any other court in this context, the district judge specifically rejected as irrelevant the evidence tending to show that such perception was either totally unreasonable and founded on a total lack of factual basis, or was founded upon misunderstandings of fact. Thus in its opinion, the district court stated:
 
 
 7
 "The state defendants (Milliken et al.) argue that the fears expressed at the hearing by parents and students were not founded in fact and should be disregarded by the court. The state defendants presented testimony that, although the placement of a correctional institution in a community is always met with initial opposition, resistance soon subsides and the community learns that the presence of a half-way house has little or no effect upon the community. However, even if we were to credit this testimony completely, we do not find such evidence relevant to the issue before us. Whether the apprehensions or fears in the community are justified is irrelevant. The court is concerned with the response of the community and the action the community may take as a result of those fears. Cass is a city-wide high school; even were resistance in the immediate area to subside in time, parents and children residing in other areas of the city would still perceive Cass as an unsafe place to send their children. It is this perception, the reasonableness of which is completely irrelevant for our purposes, that forces us to conclude that the conversion of the Evangeline Home into a correctional institution would have a devastating effect upon Cass' ability to contribute to the desegregation effort and to continue offering quality desegregated education. That the fears are not founded in fact, which we do not concede, does not make it less likely that these fears will have an adverse impact upon Cass' ability to function as the principal magnet school. Cass has been, for the past several years, struggling to overcome other 'practicalities of the situation' found to exist in the city. The apprehensions expressed at the hearing, founded in reason or not, can precipitate reactions that make it difficult for Cass to successfully continue its participation in the desegregative effort." (Emphasis supplied.)
 
 
 8
 Referring to the State's offer of evidence tending to show that other community corrections centers operated by the Department of Corrections had not generated criminal activity in the immediate vicinity, the district judge observed:
 
 
 9
 ". . . We do not agree that this evidence is relevant. It is not the impact of the correctional facility on the crime rate of an immediate area that we deem important; it is the community perception of its impact with which we are concerned. It is this community perception that will cause parents to react by withdrawing children from attendance, that will cause students to withdraw from attendance at Cass, decrease participation in the community relations program, and curtail the extracurricular activities. It is this very community perception of the impact, founded or unfounded in fact, that can bring about a devastating change in Cass' ability to fully participate in this Court's desegregation order." (Emphasis supplied.)
 
 
 10
 We do not perceive that a community perception, whether sound or unsound, or whether based on fact, myth, or misinformation, could or should provide the basis of a finding of fact or a conclusion of law to warrant injunctive relief here.
 
 II
 
 11
 As earlier indicated, the record contains testimony of both black and white parents stating that if the Evangeline Residence became a half-way house they would not enroll or re-enroll their children in Cass Technical High School. On this record, the district court found that the "community perceptions" of a half-way house would seriously impair the ability of the Cass School to operate as a magnet school in the Detroit desegregation plan. The theory of the district court is that parents, finding the advantages of the concededly superior Cass School to be overbalanced by the disadvantages that the presence of a half-way house would impose, would send their children to their neighborhood schools, thereby increasing the already disproportionate number of black or white students, as the case may be, in those schools, to the detriment of the district-wide racial pattern.
 
 
 12
 While this contention may have some theoretical merit, we can only conclude that as a practical matter the chances of the racial imbalance being adversely affected are remote in the extreme. We conclude that alarm over the possibility of such de minis consequences should not provide the basis for injunctive relief, especially since that claim may be based on unfounded fears. Nicholson v. Connecticut Half-Way House, 153 Conn. 507, 218 A.2d 383 (1966). The district court also found that placement of a half-way house at the Evangeline Residence would cause teachers at Cass to request transfers and to curtail extracurricular activities, an even more speculative determination. In terms of injunctive relief, such theorizing enters an area of impermissible speculation, and such relief may not be bottomed on unfounded fears.
 
 
 13
 Cases in which injunctive relief has been granted to end state action that impaired the effectiveness of a desegregation order involved far more tangible impairments. In Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967), aff'd sub nom. Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967), injunctive relief was ordered to terminate a program of tuition grants to students to enable them to attend private schools. In Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), injunctive relief was ordered to terminate a state program of loaning textbooks to private schools. The injunctive relief in these two cases was necessary to prevent the state from administering programs that enhanced the attractiveness of racially segregated private schooling.
 
 
 14
 In Nicholson v. Connecticut Half-Way House, supra, the defendant purchased a house in a residential area with the intention of providing a temporary residence for selected parolees from the state prison. The defendant planned to house up to fifteen men at one time, excluding sex offenders, drug addicts, and alcoholics. The primary purpose of defendant's effort was to provide those men with a home and an extensive counseling program under the guidance of a resident director trained in the field of rehabilitation. The plaintiffs were nearby residents who sought to enjoin the proposed use of the defendant's property on the ground that it would be a nuisance, alleging that the peaceful use and enjoyment of the surrounding properties were threatened. The record showed that numerous children lived in the neighborhood. However, the Connecticut Supreme Court in Nicholson, supra, 152 Conn. at 511-12, 218 A.2d at 385-86, rejected the plaintiffs' prayer for injunctive relief against the defendant's proposed use of the residence as a half-way house.
 
 
 15
 "Here the proposed use of the defendant's property, in and of itself is lawful. The only factual grounds offered to support the relief granted are the fears of the plaintiffs that the residents of defendant's halfway house will commit criminal acts in the neighborhood and the finding that the proposed use has had a depreciative effect on land values in this area. The first of these grounds goes to the core of the plaintiffs' complaint. The real objection of the plaintiffs is to the presence in the neighborhood of persons with a demonstrated capacity for criminal activity. They fear future manifestations of such activity in their neighborhood. This present fear of what may happen in the future, although genuinely felt, rests completely on supposition. The anticipation by the plaintiffs of the possible consequences of the defendant's proposed use of the property can be characterized as a speculative and intangible fear. . . .
 
 
 16
 It is clear that the power of equity to grant injunctive relief may be exercised only under demanding circumstances. . . . "No court of equity should ever grant an injunction merely because of the fears or apprehensions of the party applying for it. Those fears or apprehensions may exist without any substantial reason. Indeed they may be absolutely groundless. Restraining the action of an individual or a corporation by injunction is an extraordinary power, always to be exercised with caution, never without the most satisfactory reasons." . . . The fears and apprehensions of the plaintiff in the present case, based as they are on speculation, cannot justify the granting of injunctive relief (citations omitted).
 
 
 17
 We recognize that the Nicholson case arose in a different setting than the present case. The Connecticut Supreme Court was applying the state law of nuisance and the equitable powers of a state court to enjoin an unreasonable use of property, whereas the present case involves the requirements of federal constitutional law in the field of public education and the equitable powers of a federal district court to remove impediments to the operation of a school desegregation plan. Nevertheless, the Nicholson case is pertinent because injunctive relief was denied on the theory that a court should not exercise its equitable powers to restrain an otherwise lawful act based solely on the fears and perceptions of people in a community. Although the circumstances of overseeing the implementation of a school desegregation plan may require a district court to exercise its equitable powers more readily than when dealing with a more traditional area of law, such as nuisance, community perceptions cannot provide a sufficient basis for ordering injunctive relief even in this special context of administering a school desegregation plan.
 
 III
 
 18
 It is, of course, true that the State defendants-appellants are directly responsible under the mandate of the district court and under the Constitution itself of providing an education free of the harmful results of segregation, and that they bear the broader responsibility of providing an education for the school age children of Michigan. However, it must be kept in mind that the maintenance of an educational system is not the entire raison d'etre of all the governmental agencies and officials of the State of Michigan. Any consideration of the order of importance of the assignments of such responsibilities must remain scrupulously objective, and indeed we suspect that determinations as to the relative importance of the schools, health and welfare programs, the highway system, fiscal departments, and other functions and agencies, would vary according to, in effect, whose bull was being gored. In the present case, without in any way detracting from the importance of the educational system, sight must not be lost of the fact that fulfillment of another State responsibility is involved. In fulfilling such responsibility, the Department of Corrections has determined that a program of community corrections centers is essential to its operation, and we are not free to question that determination. As we observed earlier, these half-way houses provide places of residence for penal inmates who are approaching the earliest date upon which they could be granted parole, and are usually within six months of that date. Close supervision of the carefully screened persons accepted for the corrections centers is maintained during residency. They are required to sign out to specific locations such as places of work, and spotchecks are made to be certain that they reach such destinations. Depending upon the conduct records, the residents are accorded expanding privileges, such as permission to go to their homes in the evening for a brief time after work, occasional overnight visits with their families, and other social absences.
 
 
 19
 Since 1973 the Department of Corrections has concentrated its efforts on establishing corrections centers in the Detroit and Wayne County area. As indicated, the program is a voluntary one, and the record shows that some of the half-way houses have waiting lists, while others do not. The Department selected the Evangeline Residence location because of its proximity to the Grand River Avenue public transportation corridor, and the need for another center on that corridor was evidenced by the waiting list for an existing half-way house on that same corridor, contrasted with an absence of excess demand for other centers. For obvious reasons, the inmates choose to go to a half-way house in the community from which they came, and to which they would normally be expected to return. The record clearly establishes that judged by its own lights, reason existed for the Department of Corrections' selection of this site.
 
 
 20
 In deciding the present case, the district court specifically refused to consider the benefits to society of locating the half-way house at the Evangeline Residence. We believe that the district court erred in failing to consider those benefits. Equitable remedies are fashioned in light of the need for adjusting and reconciling public and private needs, Brown v. Board of Education, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and that can be accomplished only by a balancing of interests. Swann v. Charlotte- Mecklenberg Board of Education, 402 U.S. 1, 15-16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).
 
 IV
 
 21
 While in view of the result herein reached, no resolution of the issue is required, notation is made of the fact that defendant-appellant Salvation Army argues that in any event the district court erred in enjoining the sale of the Evangeline Residence to the State, rather than merely enjoining its proposed use. We are in agreement with this contention. The contract of sale was in no way conditioned upon the ability of the State to use the property for any specific purpose and as contended by the Salvation Army, there is no allegation made or evidence presented to indicate that the mere sale of the Evangeline Residence to the State would in any way interfere with the district court's desegregation orders, and that that Court clearly overstepped its boundaries in drafting too broad a remedy. See McNeal v. Tate County School District, 460 F.2d 568 (5th Cir. 1972), cert. denied, 413 U.S. 922, 93 S.Ct. 3049, 37 L.Ed.2d 1044 (1973).
 
 V
 
 22
 The State defendants-appellants urge that the defendant-appellee Detroit School Board lacked standing to initiate proceedings for injunctive relief in the premises. We recognize that a serious question is presented as to the jurisdiction of the federal courts to adjudicate what would otherwise be purely local problems simply because a court ordered desegregation plan is allegedly endangered. We also recognize the seeming incongruity in allowing the Detroit School Board to initiate proceedings in the district court designed to protect a school desegregation plan that it had fought. However, the court ordered desegregation plan imposed duties upon the Detroit School Board to bring the Detroit School System into accord with the Constitution's requirements. In view of the district court's continuing jurisdiction and its inherent right to enforce its own orders, which the state defendants-appellants do not question, see Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972), Raney v. Board of Education, 391 U.S. 443, 449, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), Griffin v. School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), and in the absence of clear authority to the contrary, we are not disposed to disturb the district court's determination on the ground that the Detroit School Board lacks standing in the present proceedings.
 
 
 23
 The judgment of the district court is reversed and the case is remanded to the district court with instructions to vacate the permanent injunction.