808 F.2d 385
 36 Ed. Law Rep. 1117
 UNITED STATES of America, Plaintiff-Appellee,
v.
Zandra PITTMAN, Minor Child By Her Parents and Next Friends,
Andrew and Patricia PITTMAN; Geneva Harrell and Jimmy
Harrell, Jr., Minor Children By Their Parents and Next
Friends, Jimmie and Rose Mary Harrell, et al.,
Plaintiffs-Intervenors, Appellants,
v.
The STATE of Mississippi, et al., Defendants-Appellees,
and
Hattiesburg Municipal Separate School District,
Defendant-Intervenor, Appellee.
 No. 85-4804.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 12, 1987.
 
 Nausead Stewart, Jackson, Miss., Norman J. Chachkin, William L. Robinson, Lawyers Comm. for Civil Rights Under Law, Washington, D.C., Jere Krakoff, Pittsburg, Pa., for plaintiffs-intervenors, appellants.
 Mark L. Gross, Atty., Salliann S.M. Dougherty, Educ. Opp. Lit. Sect., Civ. Rights Div., Wm. Bradford Reynolds, Atty., U.S. Dept. of Justice, Brian K. Landsberg, Atty., Washington, D.C., for U.S.
 Edwin Lloyd Pittman, Atty. Gen., Jackson, Miss., Sara E. DeLoach, Asst. Atty. Gen., Jackson, Miss., for defendants-appellees.
 Moran M. Pope, III, Moran M. Pope, Jr., Hattiesburg, Miss., J.P. Coleman, Ackerman, Miss., for defendant-intervenor, appellee.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before WISDOM, RUBIN, and HIGGINBOTHAM, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 For more than thirty years after Brown the elementary schools in Hattiesburg, Mississippi, have remained almost totally segregated. In 1970 the United States filed suit against the State of Mississippi and several State agencies and officials, seeking the desegregation of thirteen school districts. The Hattiesburg Municipal Separate School District (HMSSD) intervened as a defendant. The district court approved a pupil assignment plan embodied in a consent decree between the United States and HMSSD and in 1971 approved the school system's plan for further student desegregation, but the case lay dormant for a dozen years. The HMSSD filed the reports that it was required to file by the 1970 and 1971 orders. The district court found, however, "That the HMSSD has complied with all previous orders does not render the system unitary." In February 1984, certain black children intervened, alleging that the HMSSD elementary schools[1] had never been adequately desegregated and that the United States had failed to protect the interests of black children in the district.
 
 I. Background
 
 2
 HMSSD presents fewer barriers to desegregation than most school districts. Hattiesburg has a population of 40,000. The northeast and south residential areas of the city are predominantly black; the central and west areas of the city are predominantly white. The residential areas in the east and east-central areas of the city are more integrated. The school district is small, compact, and logistically manageable from the standpoint of desegregating by the pairing and clustering of schools. In its March 1985 report the HMSSD showed that there were in elementary schools, in grades one through six, 1740 blacks (59%) and 1195 whites (41%). Desegregation of secondary schools[2] seems to have been adequate and proceeded without turmoil.
 
 
 3
 Five of eleven of Hattiesburg's elementary schools are virtually all-black; three are more than 77 percent white, containing 905 of the 1173 white pupils. More than one third of all black children (609) attend Bethune School; five whites attend. Excluding students in grades other than 1-6 and special education students, at Grace Love School 100 percent of the children are black; at Jones 99 percent; at Eureka 94 percent; at Walthall 91 percent. Almost half of all whites in the elementary grades, 526, constitute 90 percent of the white pupils at Thames. At Grace Christian 80 percent of the children are white. At Woodley, 72 percent are white.
 
 
 4
 The HMSSD's March 15, 1985 report filed with the court shows enrollment by race in the elementary schools:
 
 
 5
 School Blacks Whites Total % Black
--------- ------ ------ ----- -------
Bethune 609 5 614 99
Jones 191 24 215 89
Eureka 165 12 177 93
Love 138 -0- 138 100
Walthall 172 17 189 91
Eaton 57 38 95 60
Davis 116 66 182 64
Camp 101 109 210 48
Christian 47 184 231 20
Thames 57 526 583 10
Woodley 87 214 301 29
 ------ ------ ----- -------
Total 1740 1195 2935 59
 
 
 6
 These figures show a somewhat smaller differential between blacks and whites than the plaintiffs' figures because they include students not in grades 1-6 (pre-K and kindergarten) and also special education students.
 
 
 7
 In July 1984 the HMSSD and the United States entered into and filed with the court a proposed consent decree providing for the modification of attendance zone lines, creation of two magnet schools, increase of majority-to-minority transfers, and educational improvements of historically black schools. The court did not rule on this proposed consent decree.
 
 
 8
 In September 1984 the court approved a consent decree submitted by the HMSSD and the plaintiffs-intervenors setting out a procedure for the submission of alternative desegregation plans for the district elementary schools. Under that decree, at the request of HMSSD, the Title IV Racial Desegregation Assistance Center,[3] and Dr. Larry Winecoff of the University of South Carolina, assisted by Dr. Barnett Joiner of Grambling University, submitted two plans, referred to as Foster Plan A[4] and Foster Plan B.[5] The HMSSD submitted its District Plan of December 10[6] and District Alternative Plan of December 10.[7] The Superintendent's Biracial Committee[8] approved both plans. On January 21, 1985, the plaintiffs-intervenors filed a plan prepared by Dr. Michael Stolee of the University of Wisconsin-Milwaukee, based on pairing and clustering schools. The United States employed Dr. Christine Rossell, a political scientist at Boston University, to evaluate the plans in terms of interracial exposure produced.[9] Dr. Rossell chose the District Alternative Plan as the best plan. The United States, the HMSSD, and the State of Mississippi entered into a proposed consent decree substantially the same as the District Alternative Plan with most of the changes Dr. Rossell recommended.
 
 II. The Consent Decree or Magnet Plan
 
 9
 This plan, approved by the district court, is based on the conversion of two of the five virtually all-black elementary schools (Jones and Walthall) into magnet facilities, with specialized curricula. Equal numbers of black and white students to the number 240 would be admitted to these schools upon approval of their voluntary applications, so as to maintain a 50 percent black, 50 percent white enrollment in each facility. A third black school (Grace Love) would be consolidated with a small, racially mixed facility (Eaton) that would be closed, resulting in a projected enrollment in grades one through six that would be 73 percent black. The two remaining virtually all-black schools, Bethune and Eureka, would neither become "magnets" nor have any white students in grades 1-6 reassigned to them. Up to 188 black students would be transferred from Walthall. Finally, several attendance zone changes would be made that would reassign black children to formerly white schools.
 
 
 10
 This appeal turns on the adequacy of the Consent Decree Plan to desegregate the elementary grades in Hattiesburg. In the opinion of this Court that plan is like a voice from the past crying for "gradualism". Constitutionally, its desegregative effect is too little and too late. All of the parties seem to have worked in good faith, with wide spread community support, and with the help of experienced experts. Some of the educational improvements seem highly desirable, but do not necessarily bear any relation to desegregation. We remand the case to the district court with the suggestion that the parties try again and that they accelerate the desegregation process.
 
 
 11
 III. Magnet Schools and Effect on Other Schools
 
 
 12
 We start with the fact that until now the HMSSD has made no serious effort to desegregate its elementary grades.[10] This long-continued operation of the dual system calls for its prompt and effective dismantling now.
 
 
 13
 The action the HMSSD proposes to take, with the district court's blessing, is primarily to provide two magnet schools, Jones and Walthall. These will not become operative until the school year, 1987-88. Whether successful or not, they will continue to function for three years. The decree was rendered in 1985; not until the end of 1991, therefore, will the court evaluate the effectiveness of the magnet schools. That is because all the experts agree that three or more years are needed for the program to become effective. For years and years this Court and the Supreme Court, in too many decisions to cite, have said the time is past for courts to postpone adequate desegregation of schools.
 
 
 14
 Each of the schools is projected to enroll at its peak 240 students. At most, therefore, 240 blacks will be desegregated by the magnet plan. Dr. Rossell conceded, however, that the school district "does not expect" Jones and Walthall "to be up to capacity."[11] As Dr. Rossell testified, reading from one of her published papers, "Schools located in minority neighborhoods tend to be under-enrolled in by whites."[12] Jones and Walthall, now 89 percent and 91 percent black, respectively, are located in black neighborhoods. If only 30 whites apply to Jones or Walthall, that school would be limited to an enrollment of 60.
 
 
 15
 First, we make the general observation that to the extent the magnet schools draw black pupils, the number of blacks in identifiably black schools will increase. The HMSSD estimates that up to 188 blacks now in Walthall will be added to Eureka, increasing its black population from 93 percent to 97 percent. We turn to the other schools. Grace Love with 138 students, all black, would be consolidated with Eaton, a small school with 57 blacks and 38 whites, which would be closed. Grace Love would receive 38 whites, who would be more segregated. Bethune will continue to be be 99 percent black although there would be some reassignment because of rezoning. Thus, 62 blacks would be rezoned to Woodley, now only 29 percent black, and 50 would be rezoned to Thames, now only 10 percent black.
 
 
 16
 There is no question at all about Eureka; it is expected to be a virtually all-black school for the foreseeable future. Dr. Spinks, HMSSD Superintendent from 1966 to 1985 testified: "I just don't think that they'll [whites will] go to that school." Tr. 88. In fact, under the proposed plan, because of reassignments required by conversion of Walthall to a magnet school, the school's enrollment will have about twice as many black pupils as it now does.
 
 
 17
 The HMSSD's experts, as well as Dr. Stolee for the plaintiffs, agreed that Bethune would remain almost totally black. Any expectation that white students would voluntarily transfer to Bethune seems unrealistic in view of the last twenty-one years, when no white elementary student exercised his freedom of choice or majority-to-minority "right" to attend Bethune or any other black school. Bethune, Eureka, and Grace Love have the lowest test scores in the system. It seems unlikely, therefore, that white students would attend these schools to take advantage of "Basic Skills Learning Centers" to be established. Restricting the Extended Day program to Bethune with the idea of attracting a hundred white students across grades 1-6 seems equally illusory.
 
 
 18
 The following table, offered by the plaintiffs but apparently accurate, compares the attendance changes in grades 1-6 of the Magnet or Consent Decree Plan with the Stolee Plan for pairing and clustering schools:
 
 
 19
 MAGNET PLAN STOLEE PLAN
 1986-87
 % Black Projected Changes in Projected
School March 1985 % Black Attendance % Black
------------------------------------------------------------------------
Bethune 99% 99% Clustered with 61%
 Thames and Love
Eureka 93% 97% Clustered with 63%
 Jones and Christian
Grace Love 100% 73% Clustered with 54%
 Bethune and
 Thames
Jones 89% 50% Clustered with 65%
 Christian and
 Eureka
Walthall 91% 50% Paired with 53%
 Woodley
Eaton 60% ___ Remains open or 54%
 included in Thames/
 Bethune/Love or (if
 Jones/Christian/ open)
 Eureka clusters
Davis 64% 64% ___ 64%
Camp 48% 47% ___ 47%
Woodley 29% 47% Paired with 53%
 Walthall
Grace Christian 20% 44% Clustered with 64%
 Jones and Eureka
Thames 10% 38% Clustered with 59%
 Bethune and Love
 
 
 20
 We do not condemn magnet schools, as such. We say that to rest the desegregation program on the magnet plan with only other minor adjustments does not comply with the Supreme Court's mandate in Swann v. Charlotte-Mecklenburg: There must be "every effort to achieve the greatest possible degree of actual desegregation".[13] The plan must be one that "promises realistically to work and promises realistically to work now." Green v. Country School Board.[14]
 
 
 21
 The defects in the Consent Decree or Magnet Plan are these:
 
 
 22
 (1) The operation of magnet schools is postponed until the school year 1987-88;
 
 
 23
 (2) The evaluation of the merits of the schools is deferred until 1991;
 
 
 24
 (3) The student population in the magnet schools is so small and the chance of achieving even the limited goal of 240 students in each magnet school is so slight that the plan fails to achieve adequate desegregation of the system as a whole;
 
 
 25
 (4) Bethune and Eureka, the two most racially isolated black schools will be scarcely affected by the magnet schools or the plan as a whole.
 
 
 26
 We see no escape from the conclusion that the magnet school plan, accompanied only by the small adjustments contemplated, do not meet the constitutional test for dismantling a long established dual system. Magnet schools should be a supplement to a mandatory desegregation plan based to a reasonable extent on mandatory reassignment and pairing and clustering of schools.
 
 IV. White Flight
 
 27
 As the district judge pointed out in his opinion: "White flight" is, of course, no justification for inaction. See United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). A court may, however, "consider anticipated white flight and choose the desegregation plan most likely to minimize white boycotts". The district court held that the "Consent Decree Plan will cause less white flight ... all the while further desegregating the system and increasing interracial exposure"; on the other hand, the "Stolee Plan is much less likely to achieve the required result of further desegregation". "While initial projections of its success appear promising ... the Stolee Plan will not ultimately lead to more fully desegregated elementary schools in the HMSSD." 622 F.Supp. 622.
 
 
 28
 We hold that the district court was clearly erroneous. This case does not present a choice between two constitutional plans. The Consent Decree Plan, even if the magnet schools come up to expectations, is fatally flawed, because it leaves virtually untouched two historically black schools, Bethune and Eureka, each having almost a totally black student body. We have here not a large number of schools with a few segregated schools. Bethune and Eureka, two of five segregated schools, have 40 percent of the black students in the elementary grades.
 
 
 29
 It is obvious that the Consent Decree was constructed with white flight as its premise. By keeping Bethune and Eureka segregated and by placing a low ceiling of 120 black students in each of the magnet schools "to make those magnet schools more attractive to the white community",[15] the Consent Decree Plan hoped to reduce white flight. This concern, legitimate when choosing among constitutionally permissible plans, cannot be "accepted as a reason for achieving less than complete uprooting of the dual public school system".[16] "White flight must be met with creativity, not with delay in segregation."[17]
 
 
 30
 Dr. Rossell, the government's star witness, has excellent credentials and has specialized in what is termed interracial exposure, that is, the "percentage of white students in the average Black child's school".[18] She testified that after two years of the magnet school plan, it would produce more interracial contacts than the Stolee plan. This may or may not be true, depending on the degree to which whites will send their children to the magnet schools and the extent of white flight from other schools. On cross-examination, Dr. Rossell testified that her calculations were not exact enough to establish that the difference between the level of "interracial exposure" under the Stolee plan and the magnet plan was more than 0.2 percentage points.[19] Perhaps because of this slight difference, the district court did not rely on Dr. Rossell's interracial exposure thesis, much as it occupied importance in the trial.[20] The district court relied squarely on Dr. Rossell's prediction that the Stolee plan would cause greater white flight than the magnet plan.[21]
 
 
 31
 Past history, future projections of school attendance, and the continued existence of the historically all-black schools of Bethune and Eureka undermine the trial court's conclusionary finding.
 
 V. Conclusion
 
 32
 We are by no means persuaded that Dr. Stolee's plan, as proposed by the plaintiffs-intervenors, will necessarily solve Hattiesburg's elementary school problems. A close study of the record, however, convinces us that the Consent Decree plan offers too little and flies in the face of the need for more action now. There are some good things in that plan. The educational improvements are excellent and should be carried out. But those educational improvements have no necessary relation to desegregating schools.[22] Magnet schools are, in general, good for a school system. But magnet schools cannot be used, as they appear to be used here, for example, partly as a sop to Cerberus, to attract white support and, hopefully, deter white flight. Some mandatory assignment and some pairing and clustering of schools will be necessary to uproot the historically segregated dual system of elementary schools in Hattiesburg.
 
 
 33
 Now is the time to move. The secondary school system seems to be desegregated and operating adequately. The HMSSD, with the aid of the United States, has been able to muster community support for a major move in the direction of desegregating the elementary grades. The Superintendent's Biracial Committee represents a broad cross-section of the community. The district judge instituted a model system of soliciting desegregation plans from qualified experts. His efforts and his thorough knowledge of the various plans, as shown in his thoughtful opinion, make us reluctant to take any radical step. We have concluded therefore, that we should remand this case to the district court with the suggestion that it direct the parties to accelerate desegregation and consider mandatory reassignment, some pairing and clustering of schools, supplemented by magnet schools. We particularly find it objectionable that Bethune and Eureka should remain, as they have always been, almost totally black.[23]
 
 
 34
 The judgment of the district court is reversed and remanded for further proceedings consistent with this opinion.
 
 
 35
 HIGGINBOTHAM, Circuit Judge, specially concurring:
 
 
 36
 I concur but write separately to explain my different perspective regarding white flight in this case and to make the point that this case is, to my mind, different from Lawrence County, Mississippi.[1] The Hattiesburg School District has never integrated its elementary schools. Over thirty years after Brown v. Board, a newly proposed magnet plan with questionable prospects, and not testable for several years, is a weak answer to a suit on behalf of the district's black children. Certainly not when so much can be had by some draw upon the proposed pairing and clustering plan, a draw that could offer few unmanageable problems, particularly if accompanied by a devotion to improving the quality of education as fervent as the devotion to the proposed magnet program.
 
 
 37
 * At the outset, there is a caveat about which there should be no mistake. The panel is unanimous in its commitment to the imperative of Brown v. Board. Our disagreements may loom large, and indeed those disagreements at times are substantial, but it would be a mistake to read division over implementation and means as division over principle and ends; here principle and ends can be collapsed into quality education without regard to race. And the fear that both cannot be achieved fuels differences over means. The testimony of the experts and the opinion of the district court reflect a brooding sense that an already suffering quality in education will be further diminished by fully mixed classes. Long perpetuated differences in the quality of their education bring black children and white children to the elementary school desks with marked differences in levels of preparation, and critically, with resulting marked differences in the level and pace of class room instruction that teachers may pursue. It seems likely that without considerable effort by educators, class instruction will be pegged at the lowered median that inevitably seems to attend a full mixing.
 
 
 38
 The attractiveness of magnet schools is, in part, their offer of a possible escape from this loss of quality in education. The offer of quality is seen as a carrot to tempt a voluntary mix, a mix with narrowed black and white levels of preparation. The allure is strong. Magnet programs as a remedy for segregated schools speak to voluntary acts and quality education, a freedom of choice with incentives to make desegregated schools a reality, achievable without the disasters of Boston. Perhaps more fundamentally, magnet programs appeal to our ethic of self determination, to a marked sense of merit, both for individual students and for the governance of school districts. This is not a criticism but a caution, because important questions lurk behind the allure of magnet plans, such as whether a particular magnet reduces disparity in the education levels of mixed blacks and whites by taking the best of the black students and turning its back on, or at least showing less concern for, the fate of the greater number of "average" black students, unable to qualify or uninterested in trying, a deficit in motivation not easily separated from the deficit in education.
 
 
 39
 Such questions are best answered by persons with training not possessed by judges, true enough. Yet, the command to eliminate segregated schools, root and branch, is of constitutional order, and ultimately must find expression in a judicial decree. That is, courts must answer actual questions, not abstract inquiries, and do so by deciding whether a particular magnet plan implements the constitutional order or whether a particular magnet plan dilutes the constitutional command.
 
 
 40
 In short, mindful that remedies must be tailored to the wrong, magnet plans, as all plans, must be individually crafted to respond to unique needs of each district in order to implement the command to eliminate segregated schools, root and branch. Just as a mindless pairing and clustering that in a quest for an elusive percentage of mix transports black children across a district to attend a school, only to find that it is now also black, fails its implementing role, so also can a mindless subscription to magnet plans fail by leaving great numbers of black children to attend black schools; plans that can be little more than freedom of choice with the twist that the choice is exercisable only by a few.
 
 
 41
 Communities and school districts with bridges over racial separation are fragile and the task of change is delicate. As I will explain, I read Judge Wisdom's opinion as responding with sensitivity; it does not reject the work of the district court, the parties and the community by a blind insistence upon the pairing and clustering of the Stolee plan, without regard to its perverse potential for greater segregation. Rather, the opinion urges further effort to reduce the numbers of children attending racially identifiable schools, an effort that draws upon both the Stolee and the magnet plans.
 
 II
 
 42
 There are three proposed clusters[2] under the Stolee plan. Even were the pairing plan adopted in full, and the panel does not even suggest that it need be, pairing the Grace Christian, Jones, and Davis schools would require no travel in excess of 2.4 miles or fifteen minutes; Woodley to Walthall is a 2.5 mile trip of fifteen minutes. Travel between Grace Love, and Thames is a trip of 6.4 miles or eighteen minutes, the longest in the district; Thames and Bethune are 3.9 miles or fifteen minutes apart. Even the magnet plan contemplates the transport of students who reside more than one mile from their school and make a majority to minority transfer.
 
 
 43
 The district court was properly concerned by a possible loss of neighborhood schools for these children of tender years and its companion, white flight. In the abstract, these concerns are understandable and cannot be ignored. But the opportunity to do more is so plain and the travel distances are so short that the plea for neighborhood schools rings hollow.
 
 
 44
 Much of the debate has here centered on the role of "white flight" and its relevance to judicial efforts to desegregate public schools. Judge Wisdom confines its relevance to a choice between constitutional plans, ignoring its potential in deciding what is required by the Constitution. At this level of generality, I agree. But that does not take us far because Hattiesburg is unquestionably operating segregated elementary schools and that operation is unconstitutional. The specter of white parents removing their children from public schools plays no part in that judgment.
 
 
 45
 The difficulty comes from our task of reviewing the district court's decision that a magnet plan is the preferred remedy for that unconstitutional condition because parents may otherwise remove their children from the district. The anticipated response of white parents cannot be ignored; at the same time fear of white flight cannot alter the constitutional command. The effectiveness of a remedy is the question and it makes no sense to construct decrees that do not grasp the real world.
 
 
 46
 The exquisite difficulty is that a decree contemplating defeat by white flight is a self-fulfilling prophecy. The experts who testified were impressive, including their opinions about anticipated reactions to the proposed plans, extrapolated from Los Angeles, California, Louisiana and Mississippi. Nonetheless, though they may be the best from the data, the studies, remain guesses if educated ones of how people may respond to various plans. Over a period of time these scholars see patterns in the responses to various plans. Apart from the fact that as yet, the data is not so rich that the perceived patterns ought to be regarded as anything more, these social scientists do not purport to gauge why people reacted as they did. So whether the responses are sheer racism, concern for educational quality, local schools, or all, remain anyone's "judgment." I welcome the confirming opinion of all the experts that local schools and quality education are essential ingredients--I venture the primary concern of parents, black and white. This concern can be met. Some draw upon the pairing and cluster plan proposed here in conjunction with a magnet program might achieve desegregation, and now. It or some combination of the magnet and pairing plans could do so with little loss of local or neighborhood schools, and minimal transportation. Even taken full measure, nothing in the pairing plan rejects the possibility for improving the quality of education in addition to desegregation.
 
 
 47
 In these cases, we tend to be less tied to the record, perhaps because our task is such an unusual judicial chore, a phenomenon I have criticized. United States v. Lawrence County School Dist., 799 F.2d 1031, 1052 (5th Cir.1986) (Higginbotham, J., concurring in part and dissenting in part). Whatever our freedom to call upon "judicial experience," that experience must lead us to disagree with the assumption, implicit in the arguments, that white citizens of Mississippi will necessarily pull away from a plan for the sole reason that it causes their children to go to school with blacks. We know from other cases, such as Lawrence County, that today this is not necessarily so. We also know that while there was a loss of white students, the use of pairing and zoning in Hattiesburg's secondary schools resulted in a system with no racially identifiable schools; surely we also know that parents in Mississippi and elsewhere, will protest with their feet dilution in the quality of education and transports of small children long distances from their homes. Particularly when, as the government's impressive expert put it--there is nothing at the end of the ride. These concerns are understandable, not illegal, not ignoble, and they must be considered. Because they need not be realized here, I join the panel in its remand, a remand that contains more praise than criticism for the district court and all parties' efforts below.
 
 
 
 [1]
 The secondary school system is not at issue in this litigation. After entry of the 1971 court order the secondary schools were fully desegregated through pairing and grade consolidation
 At the secondary level, the school system enrolled 1158 (45%) white and 1411 (55%) black students. Individual school enrollments were as follows:
 Black % White %
Burney (grade 9) 140 (52) 130 (48)
Hawkins(7-9) 365 (70) 155 (30)
Thames Jr. High (7-8) 303 (52) 282 (48)
Rowan (10) 238 (56) 189 (44)
Blair (11-12) 365 (48) 402 (52)
 
 
 [2]
 See footnote 1
 
 
 [3]
 The center, funded under Title IV of the Civil Rights Act of 1964, serves Mississippi
 
 
 [4]
 Foster Plan A is a magnet school plan with a partial same-year mandatory reassignment backup plan. It proposes the use of Bethune, Jones, and Walthall as magnet schools, reassigning students currently attending those schools to predominantly white schools. The plan also recommends closing three schools, two of which are historically black
 
 
 [5]
 Foster Plan B is a mandatory reassignment plan. It proposes the closing of two historically black schools, Eureka and Love, and the establishment of extended day programs at one formerly black school and one formerly white school
 
 
 [6]
 The District Plan is similar to the Consent Decree Plan submitted in 1984 by the United States and HMSSD
 
 
 [7]
 The District Alternative Plan adopts parts of the other plans submitted. With the addition of some of the changes recommended in Rossell's report, it comprises the Consent Decree Plan before the court
 
 
 [8]
 The Superintendent's Biracial Committee is composed of equal numbers of black and white residents of the district, including parents and non-parents who live in different attendance zones. The Committee advises the Superintendent on various issues regarding the school district and also actively participated in planning and drafting the desegregation plans submitted by the HMSSD. At trial, several members of the Committee testified, including Charles Lawrence, an attorney, newly elected member of the Hattiesburg City Council and Chairman of the NAACP Education Committee
 
 
 [9]
 "Interracial exposure" is the percentage of white students in the average black child's school. The trial judge stated that it "measures net benefit more accurately than a consideration of only racial balance". Foster Plan A would produce a greater degree of interracial exposure than the Consent Decree Plan. Dr. Rossell testified that the Foster Plan A is not the most effective because it would close three schools, two of which are historically black. This is not favored by the Biracial Committee
 
 
 [10]
 In 1964 the HMSSD used a freedom-of-choice plan under which no white student ever chose to attend a black school. The 1970 decree used pairing and grade consolidation but it was based on a system of contiguous geographic zoning which did not alter the historic racial identifiability of the schools. See Table of Enrollment by Schools. Although majority-to-minority transfers are authorized, no white student even applied for transfer, blacks averaged about 50-60 annually in recent years
 The government's expert witness, Dr. Rossell, recognized that under the magnet plan, hundreds of Black students would remain in racially identifiable Black schools for years--but she supported this feature of the plan on the theory that the Black students' failure to exercise majority-to-minority transfers made these schools constitutionally acceptable "by choice". Tr. 611. Dr. Rossell has excellent credentials as an expert on "interracial exposure", but this Court, with long experience in the field of school desegregation, knows that burdening black parents with the obligation of choosing schools is unworkable in fact and contrary to the law. The district school board not black parents and their children bears the burden of desegregating schools. Green v. County School Bd. of New Kent County, 391 U.S. 430, 441-42, 88 S.Ct. 1689, 1696, 20 L.Ed.2d 716 (1968); Raney v. Board of Educ. of Gould, 391 U.S. 443, 447-48, 88 S.Ct. 1697, 1699-1700, 20 L.Ed.2d 727 (1968); Monroe v. Board of Comm'rs of Jackson, 391 U.S. 450, 458, 88 S.Ct. 1700, 1704, 20 L.Ed.2d 733 (1968).
 
 
 [11]
 Tr. 602
 
 
 [12]
 Continuing, she read: "This was the case in Milwaukee where the inner-city magnets were 40 percent empty and in Boston where the only magnet school to fail to meet its projected enrollment was the Martin Luther King Middle School in the heart of Roxbury, a primarily black community." Tr. 602
 
 
 [13]
 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971)
 
 
 [14]
 Green v. School Board of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968)
 
 
 [15]
 Testimony of HMSSD's Dr. Walker. There was disagreement about the extent to which the magnet plan and the Stolee plan would distribute the burdens of desegregation equitably. Dr. Stolee estimated the total number of students subject to mandatory reassignments. Under the Stolee plan, 604 black and 582 white pupils will be reassigned to different schools for three, or possibly four, of the six elementary grades (Tr. 684; see Tr. 211-12, 669-72, 780). Superintendent Walker agreed that these figures were relatively equitable (Tr. 824). In contrast, under the magnet plan's attendance changes far more black than white students would be reassigned, and for all of the elementary grades. "[T]he 497 black children involuntarily transferred compared to the 65 white children is ... inequitable." Tr. 686
 Dr. Walker did not view many of these mandatory reassignments as burdensome because "[t]here are certain students in the School District plan which would be reassigned to a school which should be or which ought to be their neighborhood school" (Tr. 820); these reassignments, he said, are a "[d]isruption ... [but] not a burden" (Tr. 834; accord, Tr. 581 [Dr. Rossell]; but see Tr. 586 [individual students and parents might take a different view]. Excluding such changes, Dr. Walker calculated the magnet plan's "burdensome reassignments" as affecting 178 black and 0 white students. Tr. 820-24.
 
 
 [16]
 United States v. Scotland Neck City Board of Education, 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972)
 
 
 [17]
 Davis v. East Baton Rouge Parish School Bd., 721 F.2d 1425, 1438 (5th Cir.1983)
 
 
 [18]
 Tr. 550
 
 
 [19]
 Tr. 622-23
 
 
 [20]
 "[T]he testimony showed that the difference between the initial net benefit and effectiveness of the Consent Decree Plan and that of the Stolee Plan would be slight". See R. 714, R.Esc. 74 [Mem.Op. 12, text at n. 28]. The Stolee plan "has interracial exposure of only a few percentage points lower than that of the Consent Decree Plan". R. 716 R.Exc. 76 [Mem.Op. 14]
 
 
 [21]
 "[T]his court is of the opinion, based on the testimony of Rossell and other experts, that the Stolee Plan will not ultimately lead to more fully desegregated elementary schools in the HMSSD" (emphasis supplied). Tr. 717, R.Exc. 77
 
 
 [22]
 Dr. Stolee testified:
 Now, they've got some good ideas. They've got the basic fundamentals program that they were talking about, the basic skills program that they propose to put at, I believe, Bethune, Eureka and Love; and I commend them for doing that.... But I don't think they need desegregation as an excuse to do it. The presence or absence of a desegregation plan does not mean that they can or cannot add these good programs, and I'm assuming they'll do it.
 Secondly, I think they'll come up with some very good ideas for magnet schools. I have to say I think so, because as yet they've not told us what they're going to do with their magnets except the process, and the process is good. And those magnet schools can help provide better education, but it's also possible to put in magnet schools as a part of a mandatory assignment school desegregation plan.
 * * *
 I know I've been going on at length, but the main point is that every single educational improvement that the school system wants to and I know has in the past can be made functional within a mandatory reassignment plan.
 [T]hat [magnet] plan, I think, is a good educational plan. But this case has to do with desegregation, and it does not desegregate the School District. And I maintain that your fine educational plans can be put in place with the plaintiff-intervenors' plan which does desegregate the School District.
 
 
 [23]
 Davis v. East Baton Rouge Parish School Board, 721 F.2d 1425, 1436 (5th Cir.1983)
 
 
 [1]
 United States v. Lawrence County School Dist., 799 F.2d 1031 (5th Cir.1986)
 
 
 [2]
 It bears emphasis that we do not reject Dr. Rossell's use of "interracial exposure" as a diagnostic aid. To the contrary, this inquiry can cast light on the potential success of a proposed plan, even its objectives